We'll hear the last case, which is United States v. McFall. May it please the Court, I'm Victor Halton, counsel for Monty McFall. The trial in this case was a mess. It was pervaded with problems from beginning to end. Mr. McFall's trial attorney was woefully unprepared. He even went so far as to testify following the trial that he felt he was a ship without a sail during the trial. Yeah, well, hadn't there been other counsel? This was kind of a mess before trial, wasn't it? This case, yes, it certainly was a mess before trial. Mr. Romaine, William Romaine, who was the trial attorney, had represented Mr. McFall, I don't know the exact time, but for about approximately a year prior to the actual commencement of the trial. There's a number of issues presented by us to this Court in this case. And perhaps a logical starting point for this Court to consider, something that could have prevented a lot of the problems that manifested during the trial in this case, is when Mr. Romaine went into the Court at a trial confirmation conference eight days before the scheduled commencement date of the trial and said, Your Honor, I am unprepared, and asked to continue the trial on that basis. The Court at that time, when a court receives a representation in open court from an attorney, I am unprepared, the Court needs to accept that representation or conduct an inquiry to discern that, no, this lawyer is not, in fact, prepared. No such inquiry was conducted. But, in fact, the trial date was postponed. Maybe not in response to that request, but it was postponed. Correct? No. Not a – I mean, there had been earlier postponements, but many, many months before that. I see. So this is the – he says this one more time. Okay. This is – well, maybe – this trial date, I think January 26, 2005, don't hold me to that exact date, but approximately that, had been set for months and months in advance of that date. Then the trial attorney comes in eight days before for a hearing on unlimited motions and confirmation of the trial and says, I'm not ready to go. He – as we point out in our moving papers, he was not fully candid with the Court concerning the depths of his unpreparedness. He did not tell the Court that he had conducted zero investigation, had never hired an investigator. Had this defendant had prior counsel? Yes, he had, Your Honor. And did he dismiss them? He did – yes. He – first, he was represented by the Federal Defender's Office. And for several months – I don't know the exact period of time. Then he was represented by Bill Portonova for several months, perhaps all the way up to a year. And then approximately a year before the commencement of the trial, hired William Romaine. Now, Mr. Romaine may have, had he devoted an entire year to preparation in this case, been able to get up to speed. This is a case that involves some 17,000 pages of discovery. But he, as he testified at the hearing on the new trial motion, had not read much of the discovery. He did not have even in his possession key items of evidence, such as grand jury testimony, from a critical witness, Robert Levy. So this is just on the point of a continuance. I don't see how a trial court, when a trial attorney, who is presumed to be candid in making representations to the court in open court, avows, I am unprepared. The court says, well, the hay should be in the barn by now. I'm presuming that you're a good lawyer, that you should be getting up to speed. The court just dismissively went past counsel's representation that he is not prepared. So on that point, the court abused its discretion in denying the motion to continue. Then we have a multifaceted, ineffective assistance of counsel argument in this case. Kagan. I'm not quite on it. Okay. So your position is that he should as a matter of law have ordered a continuance when the counsel, after being, representing the defendant for a year, comes in on the day of trial, but has been set for a long time and says, I'm unprepared? Not the day of trial. Eight days before trial. Eight days before trial. Right. And then he did it again. In fact, on the day when they started the actual trial, the government announced ready. He says, Your Honor, sidebar, please. He comes up and says, I'm not ready. The government just gave me more discovery. Can we have a continuance? And the judge said, absolutely not. The trial is going. No more sidebars unless absolutely necessary. Had Mr. Romain asked for continuances prior to that, I'm not ready, eight days ahead of time? No, he did not. He asked, that was the first. There were three continuances. One, eight days before trial. One, the day of the commencement of the trial. And then one at the tail end of the case. And we've addressed each of those three continuance requests. The one at the tail end of the case was precipitated by the receipt of Brady material. Okay. Why don't you go on to your next point? I'm sorry? Why don't you go on to your next point? To the ineffective assistance of counsel. Our position is that this is a case, if there is any case, that needs to be analyzed under chronic. When you have a lawyer who has, and he's executed post-trial declarations. He testified at the hearing on the new trial motion. And he's made it clear that in a case of this magnitude and this complexity, he hired no investigator. He conducted no investigation. He failed to read discovery. He failed to obtain discovery. He put witnesses on the stand who he had never interviewed. And then they ended up giving information that was detrimental to Mr. McFall. He unwittingly opened the door to an avalanche of character evidence. Counsel, excuse me. We have quite a bit of case law that says that it's really not very appropriate to consider ineffectiveness on direct appeal because of the difficulties of establishing what else could have been done in establishing prejudice, et cetera. Why should we consider the ineffectiveness here? Because, Your Honor, and we addressed that at the outset of our briefing on the IAC issue, in the normal direct appeal, yes, you do not address habeas because habeas or, excuse me, you do not address IAC. It's normally appropriately addressed in a habeas proceeding because you're going outside the record. But in this case, we did a full new trial motion. I think that the litigation on the new trial issue, the briefing and the actual hearing, took about a year. We had a full round of briefing. We developed evidence, put it in the record. There was an evidentiary hearing. So there's no, this is no different than this case coming before the Court on a 2254 or 2255. The record is fully developed with respect to our IAC. So you're asking us to look at the new trial? I'm asking you to look at the new trial, and the IAC is fully set forth within that briefing. On issue number four in our briefing involves the interpretation of the United States Supreme Court's decision in Shidler. That case pertains to, well, this case, this trial involved a series of extortion schemes alleged against Mr. McFaul. And perhaps the most prominently featured scheme throughout the trial in this case is what we call the Calpine-Sun law scheme. It was counts two, three, and four on which Mr. McFaul was convicted. And the Shidler case deals with the definition of obtaining for purposes of Hobbs Act extortion. And that question is squarely presented in our sufficiency challenge to counts two, three, and four. What Mr. McFaul was accused by the government in its fourth superseding indictment of seeking to obtain in this case was the right of the company Calpine to solicit business by submitting a bid at the Port of Stockton. As we've gone through our new trial motion litigation and this appeal, the government has changed exactly what it is that it's contending that Mr. McFaul sought to obtain, whether it's seeking to obtain a prospective business advantage or seeking to obtain the right to build a power plant. The government's position has sort of evolved along those lines. Our position is that you have to analyze this by reference to what was charged in the indictment and what was argued to the jury by the government, which is namely the right to solicit business. And the Calpine --" excuse me, the Shidler case, and specifically the portion of the Shidler case which construes the definition of obtain by reference to a distinction between coercion and extortion, and it cites to a series of old New York cases. What was the district court's reaction to the Shidler argument? The district court, Your Honor, dealt with that issue for the first time at our new trial motion. The district court rejected our argument by relying on two cases that were relied upon by the government in its briefing at the district court and in this court, an old Second Circuit case called Tropiano and a more recent northern district court case called Dooley dealing with crab boat, crab fishermen or crab harvesters. And those two cases, well, one of them was decided before Shidler, and that was Tropiano. I think it was from the 70s, a Second Circuit case. It did not deal with the question that is presented in this case. It did not deal with the question that was presented in Shidler, namely, what is it to obtain or what does obtain mean within the Hobbs Act? And the Supreme Court made clear that what you have to obtain for it to constitute extortion is something that you can, whether it's tangible or intangible, that you can exercise, transfer or sell. If I seek to compete with a business and threaten members of that business and by threatening them, restrict their business activities or gain some type of competitive advantage, that is simply coercion. And that's what there's a listing of three New York cases, which are coercion cases. And the core holding in Shidler was that that doesn't cut it for purposes of Hobbs Act extortion. What you need is an actual obtaining. Tropiano dealt with the definition of property. It did not deal with obtaining. Now, the Dooley case is a case that we submit was simply wrongly decided. It's inconsistent with the position that we're presenting to this Court. The Dooley Court concluded that there can be an obtaining within the meaning of the Hobbs Act of the right to solicit business. But that is, we submit to this Court, inconsistent with the direct holding in Shidler and the distinction between coercion and extortion that is emphasized in Shidler. I've got about six and a half minutes here, and I'd like to reserve about five. There's a couple other points that I'd like to make, though, before I do that. And one is we have extensive briefing regarding the cross-examination of McFaul, Mr. McFaul, and some bizarre lines of questioning that were allowed to take place during that questioning. Mr. McFaul was up on the stand confronted with internal affairs reports from when he had been a deputy sheriff back in the 70s in San Joaquin County. And those sheriff's reports contained multiple layers of hearsay allegations from people that weren't in court or some people that weren't even identified that he was a gun nut, that he didn't feel like a man unless he held a gun. There were, apart from that, the government asked Mr. McFaul if he had hosted cockfighting events on his ranch. And these were things that are just complete character assassination. These were objected to. They were way beyond the pale of anything that is appropriate in a cross-examination. The district court's rationale for allowing this in was, well, Mr. McFaul's taken the stand. He's put his credibility at issue. No. Let me put into one side the hearsay aspect of, say, internal affairs reports. But staying on the character issue, the district court said he put his character at issue. The district court did not say he put his credibility at issue. Or maybe he said both. But in justifying this coming in, the district court said he put his character at issue. And, indeed, part of your IAC argument is that Mr. Romain did, indeed, put his character at issue, opening the door for all of this. What's your response to your own argument? Right. And for that very proposition, I cited this Court's decision, well, that's fine. You can open the door to character evidence. And Mr. Romain did improperly do that. He should have litigated it in limine. He should have gotten a ruling as to what he could do with his character witnesses and what that would open the door up to. But you can open the door to character evidence coming in, but you don't open the door to the suspension of the rules of evidence. The evidence that comes in after you open the door still has to be admissible. It can't be hearsay. It can't be overly prejudicial. It can't be otherwise irrelevant, which is what all of the other cases are. Well, it can be relevant. Hearsay can be relevant to reputation. Because you're not trying to say that this is what he did, but this is what the hearsay has to be offered in the form of an opinion to be relevant to reputation. And this was not that, Your Honor. This was just innuendo from reports. You know, Joe said, Bob said that Tim said that Mr. McFaul can't feel like, doesn't feel like a man unless he's holding a gun. He threatened to kill people. He, well, and then a separate episode, he supposedly threatened to, he drowned small animals in front of one of his daughters. How does that have anything to do with the issues that are involved in this case? It doesn't. It was inadmissible, improper evidence regardless of the opening of the door. So one other thing before I reserve the balance of my time. We did point out one thing, and we've repeatedly pointed this out, and the government has yet to respond to it. And this deals with this Court's model instruction number 8.117, which the government subtly modified by removing the word the from that instruction. And it changed the entire meaning of the instruction to conform to the, one of the government's theory at trial. And it's something that the government should answer. It has yet to answer that in any of its, in any proceedings in this case. And if I may reserve the rest of my time. Thank you. May it please the Court. My name is Ben Wagner. I'm an Assistant U.S. Attorney from the Eastern District of California for the United States. The evidence presented at the trial of this five-week case covered numerous different events. They occurred over a period of about two years, from 2000 to 2002. It came from numerous different sources, numerous different witnesses, numerous different evidence documents. And collectively, the evidence portrayed the defendant, Monty McFall, as a powerful but corrupt man who used threats of official, political, and economic interference and his own size and reputation for violence to intimidate and extort people who were trying to do business in San Joaquin County. And he was so brazen about it that he and his fellow partners, Mr. Dunn and Mr. Sawyer, formed a company called SMTM in order to receive the proceeds of their extortion, and SMTM stood for Show Me the Money. Now, the district court referred to the evidence on more than one occasion, the evidence in this case as overwhelming. Now, Mr. Haltom's approach on appeal, he was not at the trial, so he basically attacks all the participants in the trial. He alleges at various times that the judge was biased, that Mr. Romaine, the trial counsel, was unprepared, that the prosecutors committed misconduct. In his post-trial litigation below, he even attacked Mr. Quinn Denver, who just spoke to you in the previous argument, over his motives for filing the 2255 that is now before you. And but as hard as it is to believe, given all the paper that has been forwarded to this Court, there are quite a few counts that are not touched by this appeal except possibly affected by the IAC argument. He doesn't challenge any of the mail fraud counts. He doesn't challenge the witness tampering counts. He doesn't challenge at least a couple of the attempted extortion counts. Now, I can't, obviously, address all the issues that have been raised. Except as more broadly, IAC, or as more broadly, all that character stuff comes in, fatally taints the whole, so on. Yes. There are some of the objections that go to everything. Right. Agreed.  So turning to the ineffective assistance claim, obviously, he's got to show that Mr. Romaine's counsel fell below an objective standard of reasonableness and the deficient, that deficiency prejudices case. And Judge Anglin below, as Mr. Halter mentioned, conducted an exhaustive hearing on this. Mr. Romaine testified, and he made very clear findings that there was no prejudice and that Mr. Romaine's preparation and conduct of the trial was not deficient. Are you arguing, well, you haven't yet argued, but let me ask you this. As you know, and as Judge Schroeder just mentioned, our ordinary way of handling IAC is to do it later on 2255, if it's a federal case. Because of the extensive post-trial hearing and evidentiary hearing as part of that, are you saying that we should adjudicate IAC, or should we leave it off to 2255? No, I think you could consider it now. Can or should? You can. Or should? I think you should. I think you should. Anything that would be before you later, if you deferred that to a 2255, you wouldn't get any more than you have now. You have a full record. They presented everything they wanted to present. Mr. Romaine testified. It was a two-day hearing. And so anything you would hear then, you've already gotten the record. And that record provides ample evidence that there was no ineffective assistance here. Okay. I have one point. Who was representing the defendant at the trial at this time? Yes. Now, Mr. Romaine testified in that hearing that he had received materials well before trial from one of the co-defendants' investigators. He testified, and the Court ruled, that Mr. Romaine had read and organized the important aspects of the discovery long before trial. He had prepared binders. He had read grand jury testimony in 302s. He filed a trial brief, Mr. Romaine did, filed a trial brief, a pretrial statement, jury instructions. He filed a Rule 29 motion. He cross-examined government witnesses at length, often longer than the government took on direct. He called 17 witnesses for the defense, many of whom had very strong evidence for the defense. And when I cross-examined Mr. Romaine during the hearing, and I specifically asked him, after all of this stuff, about his preparedness, whether his – and Mr. Romaine was the only evidence that they had for this lack of preparedness argument. And I asked Mr. Romaine, well, so did your preparation fall below the standard of reasonableness under Strickland? And he said, oh, no. He said, no, I know what Strickland is about. I'm just saying I wasn't prepared to my own standards. I would have liked to have had more time. Well, I mean, every attorney just about can ask for more. What was the context of his comment about, you know, being a ship without a rudder? I think that context was – and you asked earlier, Judge Fletcher, about his request for more time. That was in the context of the fact that his co-defendants pleaded shortly before the trial, and that, he claimed, left him kind of uncertain. You think that's what triggered his latest request for a contempt? Yes. Yes. It wasn't really his lack of preparedness. It was that he claims he was caught by surprise that a week or so before trial, some of his co-defendants started pleading guilty. Now, Judge Englund below the district court found that the claim that Romaine, in light of the way the trial was conducted, the claim that he was unprepared was, quote, totally disingenuous. A second aspect of the IAC claim that I want to address is this opening the door issue. There were multiple independent witnesses who testified about various different instances of attempted extortion during this time period covered by the indictment, which followed a similar pattern, that in addition to using his political power and his economic power, he used his size. He's 6'5", 265 pounds, and his reputation for aggressiveness and violence, he made use of that as part of his modus operandi of the intimidation that he used for the extortion. So it was an integral part of the way he carried out his extortion. The district court called this evidence of his character. I prefer to call it, to consider it more as evidence of modus operandi. This is how he – and he could be a charming person at times, Mr. McFaul could. People testified about that. He was charming at trial sometimes. But when he wanted something and was demanding something, he turned down the intimidation, and this is what he used. He used his threats. Mr. Crespo, who testified on the counts 2 through 4, the Calpine extortion, said that during the delivery of the extortionate threat, while he was seated in a chair at Mr. Bedford's home, Mr. McFaul towered over him and spoke down to him and that after the meeting, Mr. Crespo was shivering. Mr. Brezak, who testified about Count 12, the William Lyons extortion count, testified that he found Mr. McFaul personally intimidating and noted that Mr. McFaul had confronted a surveyor with a gun and run him off his property. Mr. Corliss, who testified about the Golden States extortion, that's Count 11, testified about Mr. McFaul telling him that he had to break somebody's legs who didn't pay him the way he was supposed to. And then in one of the witness intimidation counts, one of the witnesses to who saw Susan Deloso, who received a threatening and intimidating telephone call from Mr. McFaul, testified that she was visibly shaken and very scared. Those are quotes from the testimony after that phone call. So this and a lot of other evidence. Mr. McFaul was telling people that he viewed himself as an – I think it was an instrument of God's wrath to punish people who do the wrong thing. He liked to use the word punish a lot. So there was this avalanche of evidence from separate but mutually corroborating sources that talked about how his M.O. was to threaten people. And so in the face of all this evidence, Mr. Romaine had very little choice. It was not one witness he could take on. It was a multitude of different witnesses. So he had no choice but to try to combat that by asking various witnesses about his reputation. Did you personally see him threaten people? Did he ever threaten you? He called his own witnesses to talk about Mr. McFaul's reputation, the fact that he didn't threaten people. And then, of course, he called Mr. McFaul himself to the stand to testify in part about how, no, he was misunderstood. He was just a big, huggable bear, and people didn't understand his humor. He had kind of a quirky sense of humor, and it was all kind of a big mistake. And the defense calls that a staggering blunder, a staggering blunder, that he called McFaul to the stand to say all that. But as the district court found in its ruling, this was not a staggering blunder. And as Mr. Romaine said at the time, this was a tactical choice. He was at the time Mr. McFaul testified, it was the end of the fourth quarter. He was on his own five-yard line. He was way behind. He had very little other option. And so the he made a reasonable decision in risking what he had to risk. Now, this is directed, of course, to the IAC claim, and what you're saying, of course, overlaps to a considerable extent, as it needs to, or as it necessarily must, with the argument about opening the door and character and so on. Could you address, to the extent that you would say something slightly different, about what testimony came in by Mr. McFaul through various questions or whatever that Romaine would have asked of his witnesses opening the door as to character? I'm sorry, what testimony? What I want to know is, Judge England justifies allowing all this stuff coming in about drowning small animals and so on based upon, well, McFaul, you opened the door by addressing character. Now, you're talking about why it was not IAC to bring this stuff in. I want a slightly different twist on it. Now, okay, well, what evidence did come in that allows Judge England to let all this other stuff come in in response? Okay. One thing that I would like to preface that discussion by saying is that when you look at the totality of the cross-examination, the appellate counsel, Mr. Halton, tried to make it appear as if this was one long character assassination. If you look at the totality of the cross, which is from pages 607 to 688 in the excerpts of record, four-fifths of that is questioning about specific testimony that Mr. McFaul had given just previous to that. Only about a fifth of it or less covers all of these issues that has been raised on appeal. So it was not a big, you know, sort of attack on Mr. McFaul's character. It was, you know, four-fifths of it at least was about it. Just a small attack on his character? Well, no. It was just a small issue in that Mr. McFaul had said on direct several times that he didn't threaten people, that he was misunderstood, et cetera. And so what that opened the door to is some limited cross-examination to impeach that testimony based on a few documented instances in which he had done the same thing before. He had used threats and intimidation against other people to get his way. And it was limited. It was relevant to that. And I think by opening the door, the government did not overstep its bounds and the Court did not abuse its discretion. Did he say anything about his reputation? Certainly other witnesses did. I'm trying to recall if he testified about his own reputation or not. He certainly said on a number of occasions that he was misunderstood, that he had a quirky sense of humor, and that he never intended to threaten. And he contradicted all of the previous. He did express reference to not intending to threaten. Yes. Yes, on several occasions. And just about these two. He was being misunderstood. Yes. As having threatened. You would say as having threatened in the past. That he misunderstood. He was misunderstood as having threatened. Exactly. Exactly. He said that. And that was kind of the thrust of his defense, is, hey, I'm not really that kind of a guy. I'm a very nice guy. I just have kind of this funny sense of humor, so people think I'm threatening them when I'm really not. So that was really a critical issue in his defense, because we were showing that this intimidation was part of his tools of extortion. Now, on these cockfighting questions, the only thing I want to say about that is, these were two questions occupied about 15 seconds of cross-examination. There was a one-sentence response, I think, in the course of a five-week trial, never mentioned before or later, never mentioned in closing argument or anything of that sort. And the one-sentence response was, I don't know.   I don't know. And the brief reason why that was asked in good faith, there was evidence of it, and the reason it was relevant is a lot of the thrust, a lot of the evidence in this case was about how Mr. McFaul and Mr. Dunn were working together and that Mr. McFaul felt he could do anything in San Joaquin County because he was protected by the sheriff. And they violated the law together in multiple ways, and this was one more way in which he could invite the public into his own home, a home which Mr. Dunn frequented, to conduct this illegal activity because he had no fear of the law. That was the relevancy of that. It demonstrated that they, yes, they did work together and they didn't care about following the law. On the Shidla issue, although the discussion was about the law, recall that this is a sufficiency of the evidence argument. And so we're entitled to quite a deferential standard of review on that. And in Mr. Haltom has claimed in his reply briefing today that we have shifted our theory about the obtaining of this property from Calpine, but we have not shifted our theory. We've used sometimes not all the same words to describe exactly what the theory is, but the theory itself has not changed. Whether you call it the right to solicit business or the right to make business decisions free from interference and coercion, it's really all the same thing. Yes, it's an intangible property right. But in Shidla, they expressly, the Court expressly left untouched in Tropiano and in other cases the concept of intangible property rights. They disagreed with the dissent's view that we're doing away with this intangible property rights and limited their holding to, we're talking about obtaining whether or not something was obtained. The property right here, there was a definition given to the jury instructions of property rights here that it includes intangible property rights. That was never challenged below and is still not challenged. And what was the evidence that it was obtained? There's this issue. What was so different in this case as from what was going on in Shidla, for example, as you know, in Shidla they were anti-abortion protesters who basically just wanted to destroy the clinic business. They didn't want to take it for themselves. But what we had here is Calpine and McFall's client, Sun Law, were competing for the same thing. They both wanted the right to build a power plant at the Port of Stockton. And importantly, Mr. McFall was not just an agent for Sun Law. If you'll look at the government supplemental excerpt of record at page 6 and at page 142 to 43, you'll find the document and the testimony that explains that Mr. McFall was going to have an equity interest in that. So that if Sun Law built a plant at the Port of Stockton, he was going to personally have he and his partners Dunn and Sawyer have a 3 percent equity interest in that plant. So there was a direct economic competition for that. So he was trying to essentially expropriate. Calpine was really the leading bidder and the eventual winner. They were the most powerful bidder in that competition for the same economic prize, and Mr. McFall wanted to essentially expropriate that for himself and his client. Now, in the Gotti case, which was cited in the Second Circuit case, cited in a footnote in the defense's reply brief, the Second Circuit basically says that in Tropiano that they noted the argument that I just made, that in Shidler they left open the intangible property that you can obtain. And they characterized Tropiano as a situation in which the defendants were essentially extorting a noncompetition agreement out of the victim. And that's one way of characterizing what was happening here. But the difference with the facts in Shidler is here we have two economic competitors, not just generally competing in the same area, but for the same exact right. And one of them wanted to take it from the other by threats and intimidation. But it is the right to bid, not the contract. Not the contract itself, that's right. Not the contract itself. So we've got to decide that the right to bid on something is intangible property within the meaning of the object. That's right. And, of course, you can't achieve the contract unless you have the right to bid on it. So it's quite fundamental to the right to do business. I understand that. But the question is whether it's a property right within the meaning of the object. Yes. Yes. Now, the other aspect that he raises with respect to this is the dropping the word the from the jury instruction. And, frankly, I'm not quite sure how that the word the got dropped or whether it was the government or the court or whatever. But in any event, that's a plain error review. It's for plain error. He didn't object to that below. It's plain error. In his own brief, the appellant's opening brief at 60, he calls this a very subtle change to the instruction. Well, if it's subtle, it can't be plain. Plain has got to be something obvious that, as you mentioned earlier in the day, Judge Fletcher, is something that affects fundamental rights. I wish the issue here that troubles me is the co-defendants and the argument that they pled and agreed to assist the government, that they would have given exculpatory testimony but that the defendant couldn't call them because they would take the fifth and the government would have to call them and you didn't. And so they were deprived of some fair trial, right? Yes. Can you address that? Yes, I can. Mr. McFaul claims that we essentially committed misconduct by not forcing them to testify over their Fifth Amendment. Now, when they pleaded, both Mr. Sawyer and Mr. Dunn pleaded to a single count and under 11C1C agreements, I believe, so that they could get out of it if they weren't sentenced to what they expected under the plea agreement. So they had a lot out there that was still contingent at the time that they pleaded, and they were only admitting a very limited amount of the conduct that they had been charged with. I'm sorry. Yeah. Okay. Go ahead. And so their Fifth Amendment rights were very real and very actionable, as the district court found. And the government, as we represented to the court, and as the attorneys for Mr. Dunn and Mr. Sawyer represented to the court, the government took no position on whether they take the Fifth or not. We didn't ask them to take it. I understand that. But the argument here is that they were not available to testify and that, therefore, their grand jury testimony should be held. Yeah. Well, and it's true that they were not available to testify, but there was no unfairness in that because the government expressly eschewed using any information. We expressly represented to the court. We did not use any information that was provided to us by Mr. Sawyer and Mr. Dunn. We did interview them. Again, they pleaded right before trial. So we had very little opportunity to investigate what they were saying, trying to corroborate it, try to evaluate them as witnesses. And, frankly, we were a little bit skeptical about what all they were saying. And, of course, they had not admitted to some of the conduct that they had been charged with. So we expressly represented the court, and we did not use at trial in any way anything that they told us. Well, I understand that. The argument here, this is different, because they see that their testimony would have been, would have been exculpatory. So, therefore, they want to read the grand jury testimony. If they weren't available to testify. There was no grand jury testimony. There were some notes of some interviews, which he keeps referring to as the Brady material. And he always leaves off the question mark, because one of the prosecutors, not myself, one of the other prosecutors who wrote down Brady question mark. Now, we never considered that Brady material. He now says that that's the Brady material. But the district court found in its order that there was nothing that it would not have been exculpatory when he was dealing with this issue. Now, there was mountains of testimony against both Mr. Dunn and Mr. Sawyer. That's why they pleaded guilty prior to trial. And, really, he has not identified anything that would have been materially exculpatory. All we would have had are two defendants offering some mostly hearsay, inadmissible – some of what he cites are, you know, their opinion that some other witness that testified for the government had some ethical problem or something. Totally. That's notes. Sawyer testifies in front of the grand jury, correct?  Yes. He did long before his plea. That's right.  And McFaul wants that testimony in. Yes. And the Court says no. Yes. And it's argued here that that was a mistake. Yes. That's a slightly different argument. I think that may be what Judge Schroeder is driving at. Oh, I'm sorry. Yeah, because there's sort of slightly two. There's the grand jury testimony and there's their assertion of the Fifth that are kind of related claims. No, it's the grand jury testimony. Yes. Now, on the grand jury testimony, the Court quite properly did not abuse its discretion under Rule 804b1, saying that when the person is not available to testify, did the person against whom, the party against whom it's offered, have a similar motive and opportunity to develop the testimony through cross-examination earlier. So he wanted to introduce Sawyer's testimony adverse to the government and is now claiming that the government had the same motive and opportunity in questioning Mr. Sawyer 13 months earlier at the outset of the investigation as toward the conclusion of the trial. And the district court quite properly found that that was that the government's motive back then was very different than it would have been at trial and it would have been unfair to introduce the testimony, and that's supported by the record and I'll tell you how. Mr. Sawyer testified back in November of 2002, and there's one fairly misleading line, I think, in the reply brief where Mr. Haltom notes that, and I'm looking at page 39 of the reply brief, and he says, Notwithstanding the government's assertion before this Court, at the hearing on the new trial motion, one of the government's prosecutors admitted that at the time of Sawyer's grand jury testimony, quote, We knew that he, meaning Sawyer, was involved in this behavior, close quote. But he left out on excerpt of record 2020 the rest of the sentence, where we said certainly we did not consider him a target at that time. I'm just trying to understand why the motive was different at the time of the grand jury, because they were trying to, presumably they were trying to bring out what Sawyer had to say. Well, a couple of things. First off they were always trying to target. Well, initially, but with Mr. Sawyer at the time that we questioned him, as I think he pointed out to the district court at the time, we weren't sure quite what to make about him. We were trying to gather information. He was not a target. There was a lot of information discovered later in the case that we could not have asked him about back then. Was McFall a target at the time? Yes. He was already charged. So you're trying to get McFall now. You were trying to get McFall then. Yes. But the question is not what is our motive at trial. The question under Rule 804b1 is what was our motive in questioning the witness. I understand that. You were trying to get it. When you questioned the witness in the grand jury, you were trying to get McFall. And at trial you're trying to get McFall. So how is your motive different one time to the other? Well, because a lot of the testimony that we were asking Mr. Sawyer about was about a lot of different ‑‑ it was about a lot of different events. It wasn't just sort of one thing that McFall said. We were looking at Mr. Dunn. We were looking at ‑‑ and we did not have a lot of information that subsequently came up. It doesn't require that it be identical. The reason for the rule about motive is we don't want to have you testify, getting somebody to testify for Purpose A, and then all of a sudden we're trying to introduce that for Purpose C, D, E, or F when there was all kinds of stuff that he could have said earlier if it was relevant to the other proposition. But here the basic proposition is you were trying to get McFall both times, and I don't see that it's very likely that the sort of opportunity you had would have been taken advantage of in a different way. Maybe there's some extraneous stuff, but I don't see that the motive is materially different for purposes of whether it's unfair to you to let that grand jury testimony come in. Well, one way in which it would have been fair is we knew by the time of trial It would have been unfair. I'm sorry? It would have been unfair. It would have been unfair to us. Well, just a minute. Now, respond to this a little different thought on unfairness. Why would it be unfair to let the defense read the grand jury testimony because the witness was available to you? You could have called the witness under your agreement. He asserted his Fifth Amendment. Oh, no. Under your agreement, he had the right to call him. Well, I suppose. So why would it be unfair? If you could, you know, bring him up and say, well, explain why you said that. Well, one of the reasons we didn't want to call Mr. Sawyer. That's why you didn't want to. Why would it be unfair? Unfair to call him? Unfair to you to let them read the grand jury material because you had the right to call the witness. Well, one reason is because if they relied simply on the grand jury testimony, we knew by the time he testified at trial that he had committed perjury in that grand jury. Well, you didn't charge him with that, did you? Oh, we did charge him with that, absolutely. And he had not. You dropped it. I'm sorry? You dropped the perjury charge. No, we did not. It was still pending at the time of trial. Oh, you eventually dropped it. Well, when he was sentenced, long after. That's what I said. You dropped it. You eventually dropped it. Well, but at the time, it was a contingent plea agreement that he was entered into. He had only agreed to plead to one count of mail fraud. We had charged him with perjury, and we would have cross-examined him on the facts of that perjury, much of which we didn't know until the trial. And so it would have been. We agreed to help you. Okay. Okay. I think we've drawn you way over time. Thank you. Thank you. Significantly, the government made 5K1.1 motions as to Mr. Sawyer, the other defendants, ratifying the truthfulness of their cooperation in addition to the not dismissing the perjury charge. The simple thing that could have gotten all this exculpatory evidence in, and it's listed in detail in bullet point format at 109 through 111 of our opening brief, the case could have just been continued until after they were sentenced. And then all of their, I mean, Bedford, who was supposedly the member of the San Joaquin County Board of Supervisors who McFaul used as a truncheon, according to the government, to facilitate all of this, has stated to us that McFaul never exercised that type of influence over him. And we've listed all that he voted his own conscience on matters before the board. All of that evidence could have come in had this case simply been continued until after these defendants were sentenced. At what point does Bedford say that? He says that to us when we come in as counsel for the new trial motion. This is after he's been safely sentenced? It was – was it after he had been sentenced? It was after he had been sentenced, yes. Well, they say lots of things after they've been sentenced. I'm sorry? They say lots of things after they've been sentenced. Sure. I mean, that certainly could be relevant to his credibility. But nevertheless, he did say that, and that's evidence that should go before the jury. The – and Sawyer made statements in what counsel sort of pejoratively characterizes as me referring to as Brady notes. Sawyer repeatedly said in grand jury, in interviews, in interviews in which he was referred to by agents as a criminal defendant, he said that, hey, there were no threats by McFaul or I in connection with the digital angel scheme, which is the one that McFaul and Sawyer were involved with together. So unless the Court has any other questions, I'll submit it. Thank you. The case just argued is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned.
judges: Schroeder, Tashima, Fletcher